IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 15-cv-01289-PAB-KLM

LEISERV, LLC, a Delaware limited liability company,

      Plaintiff,

v.

SUMMIT ENTERTAINMENT CENTERS, LLC, a Colorado limited liability company, and
SUMMIT COMPANIES INCORPORATED, a Colorado corporation,

      Defendants.

---

## ORDER

---

This matter is before the Court on Plaintiff's Motion for Partial Summary
Judgment Regarding Defendants' Lost Profits and Fiduciary Duty Counterclaims
[Docket No. 55] and Defendants' Motion for Partial Summary Judgment Regarding
Plaintiff's Claim for Lost Profits [Docket No. 56].  This Court has jurisdiction pursuant to
28 U.S.C. § 1332.

## I.  BACKGROUND[1]

This action arises out of a dispute regarding the ownership and operations of a
bowling and recreation center (the "Center") in Colorado Springs.  Defendant Summit
Entertainment Centers, LLC ("Summit") is the owner of the Center.  Docket No. 56 at 2,
Defendants' Statement of Undisputed Material Fact ("DSUMF") 1.  Plaintiff Leiserv, LLC
and its affiliate companies own or operate numerous family entertainment centers

---

[1]The following facts are undisputed unless otherwise indicated.

around the country, many under the trade name "Brunswick XL Zone."  *See* Plaintiff's

Statement of Undisputed Material Fact ("PSUMF") 7-8; Docket No. 55 at 5, ¶¶ 7-8.

Summit and Leiserv, Inc. (plaintiff's predecessor company) entered into an Operations

Services Agreement (the "Agreement"), whose effective date was April 15, 2011.

PSUMF 1; Docket No. 55 at 3, ¶ 1; *see also* Docket No. 29 at 3, ¶ 3.[2]

The Agreement includes a disclaimer that reads, in part:

**Disclaimer.**  Although the Service Provider [Leiserv] *shall act in good-faith* in
performing Services, the Service Provider warrants neither the efficacy of the
Services nor the eventual profitability of the Center.

Docket No. 19-1 at 13, ¶ 14 (emphasis in original).

Attached to and incorporated into the Agreement is Schedule A, entitled

"Services to be provided by Service Provider," which requires that the "Center shall be

operated and marketed in a manner consistent with the operational standards and

policies in effect at least seventy-five percent (75.0%) or more of the Brunswick Zone

XL bowling facilities owned or operated by Service Provider or its affiliates."  Docket No.

19-1 at 22, ¶ 3.  Schedule A further provides for the creation of operating accounts

"solely for use related to the operation of the Center.  Owner-Operator shall provide

Service Provider with access to the Operating Accounts for the purpose of depositing

monies generated by the Center, processing checks related to expenses of the Center,

and for other purpose generally related to the operation of the Center and agreed to by

the parties, which access shall be deemed necessary for the Service Provider to

perform its duties hereunder."  *Id*. at 23, ¶ 12.  The Agreement allowed plaintiff "to

---

[2] The Agreement states that disputes about the agreement are to be governed
by Colorado law.  Docket No. 19-1 at 7, ¶ 5(d); PSUMF 25; Docket No. 55 at 7, ¶ 25.

withdraw any funds necessary to reimburse Service Provider for expenses of the Center paid by Service Provider on behalf of the Center in accordance with the terms of this Agreement and any fees due Service Provider pursuant to the terms of this Agreement from the Operating Accounts by automatic pre-authorized payment plan or electronic funds transfer." *Id*. at 24, ¶ 13.

The Center opened in April 2012. Defendants' Statement of Additional Disputed Facts ("DSADF") 1; Docket No. 63 at 8, ¶ 1. At the time of the opening, the general manager was Mike Marquez. DSADF 6; Docket No. 63 at 9, ¶ 6. In July 2013, plaintiff transferred Mr. Marquez from the Center, which plaintiff operated but did not own, to a different Brunswick Zone XL bowling center that it did own. DSADF 3, 7; Docket No. 63 at 8, ¶ 3 and at 9, ¶ 7. This occurred the same month that Summit hired plaintiff's former Vice President of Operations to help develop and operate a different family fun center in Colorado. DSADF 14; Docket No. 63 at 10, ¶ 14.

The Center was very successful. In 2013, the Center was the top performing Brunswick Zone XL bowling center in the country. PSUMF 7; Docket No. 55 at 5, ¶ 7. In 2014, it was the second highest performing center. PSUMF 8; Docket No. 55 at 5, ¶ 8. In the first quarter of 2015, the last quarter plaintiff operated the Center, the Center outperformed its financial results from 2014's first quarter. PSUMF 13; Docket No. 55 at 5, ¶ 13.

During the time plaintiff operated the Center, the parties changed the way the Center's property taxes were paid. Summit made the first installment payment of property taxes in 2012. Docket No. 63 at 6-7, ¶ 22. Thereafter, at plaintiff's request, plaintiff began receiving the property tax bills and paying them. *Id*. Each month,

plaintiff would request and withdraw money from the Center's Operating Account to pay future taxes as they came due and would deposit that money in plaintiff's own account. *Id*. Defendants claim that, despite accruing funds, plaintiff did not make required property tax payments in 2014 and 2015.  PSUMF 24; Docket No. 55 at 7, ¶ 24.

Disputes between Leiserv and Summit arose after Leiserv was purchased by Bowlmor AMF Corp. in the summer of 2014.  Plaintiff's Statement of Additional Disputed Facts ("PSADF") 1; Docket No. 66 at 2, ¶ 1.  On April 19, 2015, Summit took over operations of the Center.  PSUMF 2; Docket No. 55 at 3, ¶ 2.  On June 17, 2015, Leiserv notified Summit of its intent to exercise a purchase option in the agreement based on an alleged appraised value of $5,100,000.  PSADF 7; Docket No. 66 at 3, ¶ 7; Docket No. 43 at 3.  Before the filing of litigation, the parties unsuccessfully participated in non-binding mediation.  DSUMF 3; Docket No. 56 at 2, ¶ 3.

On June 18, 2015, Leiserv filed a complaint in this Court alleging, in part, that defendants breached the Agreement by not negotiating the fair market value of the Center in good faith.  Docket No. 1 at 5-6.  Plaintiff alleges that defendants' failure to negotiate in good faith is "delaying its ownership and enjoyment of the profits of the Center."  Docket No. 1 at 6, ¶ 27.  On July 10, 2015, defendants filed counterclaims alleging, in part, that plaintiff breached its obligations of good faith and fair dealing under the Agreement by "mismanaging the business affairs of the Center (through personnel and other maneuverings) to deflate the value of the Center."  Docket No. 13 at 13, ¶ 31.  Defendants also counterclaimed that plaintiff breached its fiduciary duty to Summit by failing to pay the Center's property taxes with funds it accrued for that purpose.  *Id.* at 17-18.

4

On May 31, 2016, the parties filed the present cross-motions for partial summary judgment.  Docket Nos. 55, 56.  Plaintiff's motion argues that it disclaimed all warranties of profitability in the Agreement and, therefore, defendants cannot seek lost profits under their counterclaims.  Docket No. 55 at 9-11.  Plaintiff's motion also argues that defendants cannot show that plaintiff was a fiduciary with respect to holding business proceeds to pay taxes or, in the alternative, that the claim is barred under the economic value rule because it is properly a breach of contract claim.  *Id*. at 11-13.  Defendants' motion argues that plaintiff cannot prove lost profits damages because potential damages are speculative and evidence of defendants' conduct during the mediation is not admissible.  Docket No. 56 at 3-7.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal quotation marks omitted)). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115 (citation omitted). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

## III. PLAINTIFF'S SUMMARY JUDGMENT MOTION

### A. Defendants' Lost Profits Claim

Plaintiff argues that it is entitled to summary judgment on that portion of defendants' counterclaim seeking lost profits because, in the Agreement, plaintiff disclaimed all warranties of profitability. Docket No. 55 at 9-10 (citing Docket No. 19-1 at 13, ¶ 14). Plaintiff also argues that the Center "consistently outperformed the

contractual benchmarks for incentive payments under the Agreement for extraordinary revenue and profits during the Center's first two full years of operations, and was on track to do so again in 2015 prior to the termination of the Agreement." *Id.* at 10 (citing PSUMF 11-13; Docket No. 55 at 5, ¶¶ 11-13; Docket No. 19-1 at 2-3, ¶ 3(b)(i)-(ii)).  On the basis of this performance while the Center was under its management, plaintiff argues that no reasonable jury could find for defendants.

Defendants respond that their lost profits claim is not based on any warranties and is instead based on plaintiff's transfer of the Center's general manager, Mr. Marquez, in breach of plaintiff's internal policies and in bad faith.  Docket No. 63 at 13-14.  Defendants argue that a violation of plaintiff's policies is also a breach of the Agreement's requirement that the Center be run "in a manner consistent with the operational standards and policies in effect [in] at least seventy-five percent (75.0%) or more of the Brunswick Zone XL bowling facilities owned or operated by [plaintiff] or its affiliates."  Docket No. 19-1 at 22, ¶ 3; DSADF ¶ 4; Docket No. 63 at 8, ¶ 4. Alternatively, defendants argue that Mr. Marquez's transfer was in retaliation for Mr. MacBrayne retiring from plaintiff's affiliate and joining defendant Summit Companies to work on a competing family entertainment center.  DSADF 14; Docket No. 63 at 10, ¶ 14.

Under Colorado law, "[i]nterpretation of a written contract is a question of law for the court." *In re Marriage of Thomason,* 802 P.2d 1189, 1190 (Colo. App. 1990) (citing *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo. 1984)).  The primary goal of contract construction is to determine and effectuate the intent and reasonable expectations of the parties.  *Copper Mountain, Inc. v. Industrial Sys., Inc.,* 208 P.3d

692, 697 (Colo. 2009).   Contract language must be examined and construed consistently with the plain and generally accepted meaning of the words employed.  *Id.*; *see Pepcol Mfg. Co.,* 687 P.2d at 1313-14 ("In the absence of contrary manifestation of intent in the contract itself, contractual terms that have a generally prevailing meaning will be interpreted according to that meaning.").  "The court should interpret a contract in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless."  *Copper Mountain*, 208 P.3d at 697 (internal quotation marks omitted).  "Extraneous evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract."  *USI Props. E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997); *see also Pepcol Mfg. Co.*, 687 P.2d at 1314 ("It is axiomatic that in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence.").

The portion of the Disclaimer clause, Paragraph 14 of the Agreement, that plaintiff relies upon states: "Although the Service Provider [Leiserv] *shall act in good-faith* in performing Services, the Service Provider warrants neither the efficacy of the Services nor the eventual profitability of the Center."  Docket No. 19-1 at 13.  The first part of this sentence indicates that Leiserv "*shall act in good-faith* in performing Services."  Defendants' claim for lost profits in their counterclaims is not, as they note in their response, based on a breach of Leiserv's duty to obtain a certain level of profitability, but rather on a breach of its good faith duty to perform other duties.  *See* Docket No. 63 at 13.  Plaintiff points to no language in the Disclaimer clause that would somehow contractually preclude defendants from including lost profits as part of a claim

that plaintiff breached its duty of good faith in performing services.  In fact, Section 5(e) of the Agreement, entitled "Limitation of Damages," allows a party to recover "any actual damages sustained by such Party."  Docket No. 56-2 at 8.  Plaintiff does not argue that the term "actual damages" in Section 5(e) excludes lost profits.  *See Optimal Interiors, LLC v. HON Co.*, 774 F. Supp. 2d 993, 1010 (S.D. Iowa 2011) (collecting cases holding that damage limitation clauses that exclude consequential damages do not prevent a party from recovering direct lost profits); *see also Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1155 (10th Cir. 2007).  The Court agrees with defendants that the Disclaimer clause does not foreclose their ability to seek lost profits based upon plaintiff's alleged breaches of the other provisions of the Agreement they have identified.

The Court will not grant summary judgment based on plaintiff's general argument that no reasonable jury could find it liable for lost profits in light of the success of the Center.  Docket No. 55 at 10-11.  Plaintiff provides no evidence foreclosing the possibility that the Center could have been more profitable, for example, under the continued management of Mr. Marquez.  The Court will also deny summary judgment to plaintiff on its notice and cure theories, which were raised for the first time in its reply brief.  *See* Docket No. 71 at 6.  Accordingly, plaintiff's motion for summary judgment will be denied with respect to defendants' request for relief for actual damages, including lost profits.

## B.   Summit's Fiduciary Duty Claim

Summit's counterclaim alleges that, when plaintiff began to collect funds to pay

the Center's property taxes, it "accepted this duty to hold Summit Entertainment's property (i.e. the Tax Funds) in trust and to pay its taxes therewith."  Docket No. 13 at 15, ¶ 37.  Defendants claim that, by failing to use all of those funds to pay the Center's property taxes or return the funds to defendants, plaintiff breached a fiduciary duty it had to Summit.  *Id*.

Plaintiff argues that it was never a trustee or escrow agent of defendants and, as a result, did not owe a fiduciary duty to defendants.  Docket No. 55 at 11-12.  In the alternative, plaintiff argues that the economic loss rule bars Summit's fiduciary duty claim because its withdrawals were made pursuant to the Agreement and any claim must therefore be made as a breach of contract claim.  *Id*. at 13 (citing *Casey v. Colorado Higher Educ. Ins. Benefits All. Trust*, 310 P.3d 196, 202-03, *as modified on denial of reh'g* (Colo. App. Sept. 13, 2012)).[3]

Defendants respond that they can show a fiduciary relationship because plaintiff assumed duties not set out in the Agreement.  Docket No. 63 at 14-17.  Defendants argue that plaintiff became Summit's agent by "assuming the duties of paying Summit Entertainment's property taxes and holding the funds necessary to do so."  Docket No. 63 at 16 (citing *Hart v. Colorado Real Estate Commission*, 702 P.2d 763, 765 (Colo. App. 1985)).  Defendants further argue that the economic loss rule does not apply

---

[3] Plaintiff also argues that the affidavit of Tracy Woodward should be disregarded as an attempt to create a sham fact issue that defendants placed a high degree of trust in plaintiff.  Docket No. 71 at 8.  This argument is unavailing because the fiduciary relationship could also arise from control of defendants' monies.  *See Bailey v. Allstate Ins. Co.*, 844 P.2d 1336, 1339 (Colo. App. 1992).  Likewise, plaintiffs argument that it set off the accrued funds as part of the termination fails because it does not point to any evidence that it actually did so.  *See* Docket No. 71 at 9.

"because Plaintiff's control over the tax funds and its duty to pay property taxes are not controlled or memorialized" by the Agreement.  *Id*.  In particular, defendants argue that the Agreement does not provide for plaintiff holding and paying the tax funds on behalf of Summit.  *Id*. at 17.

The economic loss rule prevents parties from asserting a tort claim, such as breach of fiduciary duty, where the party's loss results from a breach of an express or implied contractual duty.  *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000) ("a party suffering only economic loss from a breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law.").[4]   Courts must initially identify "the source of the duties of the parties."  *Town of Alma*, 10 P.3d at 1262.  "Tort obligations generally arise from duties imposed by law," while "[i]n contrast, contract obligations arise from promises made between parties."  *Id.* ("'A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie.'" (quoting *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995))).[5]  As the Colorado Supreme

---

[4] The Colorado Supreme Court has identified "three main policy reasons" that support the application of the rule "between and among commercial parties . . .:  (1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build the cost considerations into the contract because they will not be able to recover economic damages in tort."  *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004).

[5] *See Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 291 (Colo. App. 2009) ("The court in [*Town of Alma*] did not draw any bright lines among types of torts (e.g., fraud, negligence) that are always barred by the economic loss rule, those that may be barred, and those that are never barred.").

Court made clear, the focus should not be on the nature of the loss, i.e., whether it is economic, but rather on the source of the duty. *Id.* at 1262 n.8 ("[W]e believe that a more accurate designation of what is commonly termed the 'economic loss rule' would be the 'independent duty rule.'").

"[S]ome special relationships by their nature automatically trigger an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship." *Id.* at 1263 (citing cases involving the attorney-client relationship, the physician-patient relationship, and the "quasi-fiduciary nature of insurer-insured relationship"). Colorado law also recognizes that "certain common law claims that sound in tort and are expressly designed to remedy economic loss *may* exist independent of a breach of contract claim." *Id.* (citing cases arising out of common law fraud and negligent misrepresentation) (emphasis added). In order to avoid the application of the economic loss rule, one must not only identify an independent duty but must also be asserting a tort claim *based on* that independent duty. Where, however, the only allegation in the tort claim is the breach of "promises the parties have made to each other," the claim sounds in contract. *A.C. Excavating v. Yacht Club II Homeowners Assoc., Inc.*, 114 P.3d 862, 865-66 (Colo. 2005).

The Court finds that the economic loss rule bars Summit's fiduciary duty claim. The Agreement provides for the creation and maintenance of the Operating Account used to pay the expenses of the Center. Docket No. 19-1 at 23-24, ¶¶ 12-13. While the Agreement may be silent on taxes, it provides a mechanism for plaintiff to access funds in order to pay expenses and that right extends to "other purpose[s] generally

12

related to the operation of the Center and agreed to by the parties, which access shall be deemed necessary for the [plaintiff] to perform its duties hereunder." *Id*. at 23, ¶ 12. To the extent that defendants allege plaintiff withdrew funds to pay taxes for the Center that it did not pay, such a claim is also related to the Agreement's provision that plaintiff "shall be allowed to withdraw any funds necessary to reimburse [plaintiff] for expenses of the Center paid by [plaintiff] on behalf of the Center in accordance with the terms of this Agreement." *Id*. at 24, ¶ 13.  As defendants acknowledge, the parties agreed that plaintiff could withdraw and accrue funds to pay taxes, PSUMF 19; Docket No. 55 at 6, ¶ 19, and the Court finds such actions are related to the Agreement's provisions for access to and withdrawal of funds in the Operating Account.  To the extent that defendants argue that plaintiff failed to use funds withdrawn from the operating account for payment of the Center's expenses, i.e., taxes, those claims are properly breach of contract claims because they arise from plaintiff's duties under the Agreement.[6]  *See A.C. Excavating*, 114 P.3d 862, 865-66.  Accordingly, defendants' breach of fiduciary duty claims are barred under the economic loss rule.  *Town of Alma*, 10 P.3d at 1262. Therefore, the Court will grant plaintiff's motion for summary judgment with respect to Summit's breach of fiduciary duty claim regarding property taxes.

## IV.  DEFENDANTS' SUMMARY JUDGMENT MOTION

### A.  Whether the Lost Profits Damages are Speculative

Defendants argue that plaintiff's claim for lost profits is too speculative.  First,

---

[6] It may be the case that the parties' agreement on the payment of taxes is more properly viewed as a separate contract.  The economic loss rule would also apply under that analysis.

defendants argue that, even if the parties had agreed on a fair market price for the

Center,[7] it is speculative to assume that plaintiff would have closed the sale because of

the "many hurdles before consummation of the transaction."  Docket No. 56 at 4 (citing

Docket No. 56-5 at 2-7, 60:8-65:25).  Second, defendants argue that plaintiff has failed

to provide any estimation of the profits plaintiff would have made, but instead

improperly seeks to recover the profit that defendants made operating the Center.  *Id.*

at 5-6.

        Plaintiff responds that, had defendants negotiated in good faith, the parties

would have been able to agree on other terms beyond the fair market value and that

basing its damages on defendants' economic results is not speculative, but instead

"grounded in the actual operation of the business" and reliant on "actual financial data

for the Center."  *Id.* at 4-5.

_____

        [7] The Agreement contains the following purchase option clause:

(c)  <u>Service Provider Purchase Option</u>.

        (i)  Upon termination of the Operations Services Agreement for any
reason, [Leiserv] shall have the exclusive option to purchase the Center
from [Summit] for fair market value.  [Summit] and [Leiserv] agree to
negotiate fair market value and the purchase price in good faith.

        (ii)  [Leiserv] must provide written notice within sixty (60) days
following termination to [Summit] of its intent to exercise the Purchase
Option.

Docket No. 19-1 at 5, ¶ 4(c) (emphasis original).  On August 17, 2015, Summit filed a
motion for summary judgment seeking a determination from the Court that the purchase
option is unenforceable as an agreement to agree.  Docket No. 19 at 7.  On March 16,
2016, the Court denied the motion, finding that the "a lack of resolution on certain
details of a transaction" did not render the purchase option unenforceable.  Docket No.
43 at 11.

The general rule under Colorado law is that damages for lost profits may be awarded in breach of contract cases, but only if they can be proved with "reasonable certainty." *Denny Constr., Inc. v. City & Cty. of Denver ex rel. Bd. of Water Comm'rs*, 199 P.3d 742, 746 (Colo. 2009). To meet this burden, "a plaintiff contractor may establish a reasonable basis for computing the amount of lost profits by presenting evidence of prior profitability." *Id*. at 748 (citations omitted); *see also Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1382 (Colo. 1993).

The hurdles plaintiff would have needed to surmount had the parties agreed on a fair market value are not enough to find, as a matter of law, that plaintiff's claims are speculative. Plaintiff took steps to buy the Center by invoking the purchase option. Although defendants suggest plaintiff might have changed its mind and point to several things plaintiff would have had to do in order to buy and run the Center, such as a "title search, environmental study, and review of financial statements," defendants do not point to any evidence that plaintiff did change its mind or that plaintiff could not have successfully accomplished the steps. Docket No. 56 at 4. Uncertainty about the future does not render lost profits uncertain where a plaintiff can show past profitability. *Denny Constr.*, 199 P.3d at 748. Rather, it is enough that a plaintiff can establish that the business was profitable before the breach of contract occurred. *Lee v. Durango Music*, 355 P.2d 1083, 1088 (1960) ("The expenses of the business, including depreciation of capital, deducted from its income for a few months or years prior to such interruption, produces the customary net profits of the business during that time, and from this fixed data and these facts an estimate can be made of the plaintiff's loss

during the period the business was interrupted."). Plaintiff has put forward sufficient evidence to show that the Center was profitable before the alleged breach. *E.g.*, PSUMF 12, 13; Docket No. 55 at 5, ¶¶ 12-13. Further, it is reasonable for plaintiff to claim it could have realized similar profits to defendants' due to plaintiff's "wide experience" in the field and the demonstrated profitability of the Center. *Denny Constr., Inc.*, 199 P.3d at 748 (internal quotation marks omitted); *see also Acoustic Mktg. Research, Inc.*, 198 P.3d at 98 (declining to hold future royalties uncertain as a matter of law and analogizing to cases where courts have "allowed recovery of lost royalties when a franchisee terminates or repudiates a franchise agreement, as long as the franchisor can demonstrate that, but for the breach, the business would have enjoyed continued success" (citations omitted)). Therefore, the Court finds that, because there is "sufficient reliable evidence" that profits would have accrued to plaintiff but for defendants' alleged breach, "the jury should be permitted to assess the amount of the lost" profits. *Acoustic Mktg. Research, Inc.*, 198 P.3d at 99.

## B.   Whether Evidence from the Mediation Must Be Excluded

Defendants argue that plaintiff cannot prove its bad faith claim based on evidence from the parties' negotiation because "evidence of negotiations, at the mediation or otherwise, is not admissible." Docket No. 56 at 7 (citing *Weir v. Federal Ins. Co.*, 811 F.2d 1387 (10th Cir. 1987)).

Plaintiff responds that it will not attempt "to prove or disprove the fair market value of the Center" through defendants' mediation conduct, Docket No. 68 at 6 (emphasis omitted), but rather use such evidence to show defendants' bad faith. *Id*. at

7 (citing *Cook v. Morgan Stanley Smith Barney*, 2014 WL 4064000, at *6 (S.D. Tex.

Aug. 15, 2014); *S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 50 F.3d 476, 480

(7th Cir. 1995); *Gelinas v. Metro. Property & Liability Ins. Co.*, 551 A.2d 962, 969 (N.H.

1988)).

Federal Rule of Evidence 408 provides:

(a) **Prohibited Uses.**  Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
(1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and
(2) conduct or a statement made during compromise negotiations about the claim--except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
(b) Exceptions.  The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408.

Contrary to defendants' argument, "Rule 408 is not an absolute prohibition on

the admission of evidence regarding settlement negotiations."  *Burlington N. Santa Fe*

*Ry. Co. v. A 50-foot Wide Easement Consisting of 6.99 Acres More or Less*, 346 F.

App'x 297, 302 (10th Cir. 2009) (unpublished) (upholding admission of evidence to

show bad faith settlement negotiations).  As plaintiff correctly points out, evidence of the

settlement negotiations regarding claims other than those at issue is admissible.

*Broadcort Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1194 (10th Cir. 1992)

("Here, the evidence related to an entirely different claim—the evidence was not

admitted to prove the validity or amount of the claim under negotiation." (internal

quotation marks omitted)).  In particular, evidence of settlement discussions is admissible to show that a party acted in bad faith in carrying out its obligations under a contract so long as it is not used to prove or disprove liability on the claim being settled or the amount of that claim.  *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 770 (10th Cir. 1997).

Here, plaintiff allegedly seeks to admit evidence that defendants sought an unreasonably high price for the Center during contractually-mandated negotiations. Docket No. 56 at 7.  While this evidence would provide a basis for plaintiff's breach of contract claim, the breach of contract claim was not the subject of the negotiations and mediation.  Further, such evidence would not prove the validity or amount of plaintiff's lost profit damages, which are premised on the profitability of the Center, rather than its value.  *See* Docket No. 56 at 6.  Although such evidence may be potentially relevant to plaintiff's breach of contract claim, defendants are free to propose a limiting instruction on that issue.[8]  Accordingly, the Court finds that Fed. R. Evid. 408 is inapplicable.  *See Towerridge, Inc.*, 111 F.3d at 770.

## V.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment Regarding Defendants' Lost Profits and Fiduciary Duty Counterclaims [Docket No. 55] is

---

[8] A limiting instruction would be sufficient to address any resulting prejudice to defendants.  *See S.E.C. v. Peters*, 978 F.2d 1162, 1172 (10th Cir. 1992) (discussing the Advisory Committee Note to Fed. R. Evid. 403).

**GRANTED** in part and **DENIED** in part as set forth in this order.  It is further

ORDERED that Defendants' Motion for Partial Summary Judgment Regarding

Plaintiff's Claim for Lost Profits [Docket No. 56] is **DENIED**.

DATED February 6, 2017.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge